[No. 41162-4-I.    Division One.    June 14, 1999.]
DIANA J. CHESTERFIELD, *Respondent*, v. JAMES E. NASH, *Appellant*.

---

[17]*See Collinsworth*, 90 Wn. App. at 553-54.

[18]*See* RCW 9A.56.190 and .210.

[19]*See State v. Camarillo*, 115 Wn.2d 60, 71, 794 P.2d 850 (1990).

*Catherine Wright Smith* of *Edwards, Sieh, Smith & Goodfriend, P.S.*, for appellant.

*Mary L. Gaudio* of *Mary L. Gaudio, Inc.*, for respondent.

KENNEDY, C.J. — James Nash appeals the trial court's order awarding a monetary judgment to Diana Chesterfield, with whom he cohabited for four years. He contends that the trial court erred by concluding that his relationship with Chesterfield was a meretricious relationship as defined in Washington case law and by dividing property that they acquired during their relationship, including professional goodwill in Nash's dental practice.

The trial court's findings in this case are supported by substantial evidence and support its legal conclusion that Chesterfield and Nash had a meretricious relationship, i.e., a stable, marital-like relationship where both parties cohabit with knowledge that a lawful marriage between them does not exist. Because Nash failed to establish by clear and convincing proof that the professional goodwill in his dental practice is properly characterized as separate property, it is presumed to be owned by both parties and is subject to a just and equitable distribution under *Connell v. Francisco*, 127 Wn.2d 339, 351, 898 P.2d 831 (1995). Accordingly, we affirm.

## FACTS

James Nash and Diana Chesterfield continuously cohabited in a house owned by Chesterfield from July 1989 until October 1993. Nash and Chesterfield knew that they were not married and did not hold themselves out as being married. During their cohabitation, Nash owned a dental practice and Chesterfield worked for Nordstrom. Each was mutually supportive of the other's career and pooled resources to pay their joint living expenses, including mortgage payments on Chesterfield's house. When the relationship ended, Nash moved out of Chesterfield's house. Although the couple temporarily reconciled, Nash did not cohabit with Chesterfield after this time.

In January 1996, Chesterfield filed a complaint against Nash in King County Superior Court, seeking compensation for her efforts during the couple's cohabitation. The

trial court found that the parties had a meretricious relationship during which they accumulated "community" property, including goodwill in Nash's dental practice. The court divided that property on a 60/40 basis in favor of Nash, awarding Chesterfield $75,594 plus $302.50 in costs. Nash appeals.

## DISCUSSION
### I. "Meretricious Relationship"

Nash contends that the court erred by characterizing his relationship with Chesterfield as a meretricious relationship.

"A meretricious[1] relationship is a stable, marital-like relationship where both parties cohabit with knowledge that a lawful marriage between them does not exist." *Connell*, 127 Wn.2d at 346. To determine whether a meretricious relationship exists, the court may consider, among other factors, "continuous cohabitation, duration of the relationship, purpose of the relationship, pooling of resources and services for joint projects, and the intent of the parties." *Id.* Instead of following a rigid set of requirements, "a court should examine each case on its facts." *Zion Constr., Inc. v. Gilmore*, 78 Wn. App. 87, 90, 895 P.2d 864 (1995). "The standard of review is whether substantial evidence supports the trial court findings of fact, which in turn support the court's conclusions of law." *In re Marriage of Pennington*, 93 Wn. App. 913, 917, 971 P.2d 98 (1999). Unchallenged findings of fact are verities on appeal. *Cowiche Canyon Conservancy v. Bosley*, 118 Wn.2d 801, 808, 828 P.2d 549 (1992).

Nash challenges the trial court's finding that he and Chesterfield functioned as a married couple with regard to work: "In the support each offered the other in their work, they functioned as one would expect a married couple to

---

[1]Although the term, "meretricious" is "offensive, demeaning, and sexist[,]" courts will continue to use it until a legally precise expression emerges to replace it. *Peffley-Warner v. Bowen*, 113 Wn.2d 243, 246 n.5, 778 P.2d 1022 (1989).

function." Clerk's Papers at 12-13. But Nash does not dispute the trial court's findings that Chesterfield and Nash were "mutually supportive of each other's work" in that they assisted each other in various work-related tasks:

> During the period of cohabitation Dr. Nash assisted Ms. Chesterfield with some work related travel logs. Ms. Chesterfield supported Dr. Nash by doing some chair-side assisting for emergencies, assisting with accounts payable, assisting in his role as secretary for his study club, and assisting in the creation of office correspondence. Ms. Chesterfield made professional referrals to Dr. Nash.

*Id.* at 12. This unchallenged finding is a verity on appeal. *Cowiche Canyon*, 118 Wn.2d at 808. Moreover, Chesterfield testified that she helped Nash with his practice without expecting payment for her services "because we were building a life together." Report of Proceedings at 66 (June 10, 1997). During trial, Chesterfield also elicited testimony that she and Nash had planned marriage and a family together, and had planned their retirement based on the expectation that she could stop working in favor of raising children, and Nash could retire at the age of 55 if his dental practice did well. In sum, the record contains substantial evidence in support of the trial court's finding that Nash and Chesterfield functioned as a married couple with regard to their work.

Nash argues nevertheless that the parties did not have a meretricious relationship as a matter of law because they pooled resources only for joint living expenses and not for joint investments, because they knew full well that they were not married, because Chesterfield continued with her own career during the relationship, and because Chesterfield testified that she would not have been willing to pull money from her profit-sharing plan for a down payment on jointly owned residential real property unless the parties had married. None of this evidence defeats as a matter of law the trial court's finding that the parties functioned as a married couple with regard to their work. That the parties knew they were not married is part of the definition of a

meretricious relationship. Many married women continue with their own careers—that a woman in a meretricious relationship may do the same signifies nothing dispositive. Pooling of resources for joint living expenses is a pooling of resources, and thus a factor to be considered, whether or not the parties also pool monetary resources for joint investments.

Nash also does not challenge the trial court's findings that Chesterfield and Nash cohabited continuously from July 1989 until October 1993 in a house owned by Chesterfield and pooled resources to pay living expenses. The record reflects that Nash's name did not appear on the title of the house in which they lived, and that Chesterfield and Nash did not hold themselves out as being married or commingle their resources for purposes other than living expenses. Nonetheless, Chesterfield and Nash lived together continuously in a stable, mutually-supportive relationship for longer than four years, functioning as one would expect a married couple to function with regard to work. Thus, the trial court's findings support its legal conclusion that Chesterfield and Nash had a meretricious relationship.

## II. Property Division

Nash argues that division of property is not appropriate in this case because neither he nor Chesterfield became unjustly enriched as a result of their cohabitation.

■ ■ Our Supreme Court has held that "[a]ll property considered to be owned by both parties is before the court and is subject to a just and equitable distribution" at the demise of a meretricious relationship. *Connell*, 127 Wn.2d at 351. Although a meretricious relationship is not a marriage, the definitions of "separate" and "community" property in RCW 26.16.010-.030 nonetheless apply by analogy. *Id.*; *see also In re Marriage of Lindsey*, 101 Wn.2d 299, 304, 678 P.2d 328 (1984). Although each party's separate property is not divisible at the end of a meretricious relationship, there is a rebuttable presumption that all property

acquired during the relationship is owned by both parties. *Connell*, 127 Wn.2d at 350-51.

The party who claims that the property at issue is his or her separate property may overcome this presumption by "clear and convincing proof" that the property is properly characterized as separate property. *Estate of Madsen v. Commissioner of Internal Revenue*, 97 Wn.2d 792, 796, 650 P.2d 196 (1982), *overruled on other grounds by Aetna Life Ins. Co. v. Wadsworth*, 102 Wn.2d 652, 659-60, 689 P.2d 46 (1984), *cited in Connell*, 127 Wn.2d at 351. "To effectively rebut the presumption that property acquired during marriage is community property, a party asserting that an item of property acquired during marriage is separate property must be able to trace 'with some degree of particularity' the separate source of the funds used for the acquisition." *In re Marriage of Hurd*, 69 Wn. App. 38, 50, 848 P.2d 185 (1993) (citations omitted).

■ Nash argues that equity does not require division of property acquired during a meretricious relationship except where there has been pooling of funds for joint projects or forgone opportunities in favor the of relationship that would result in unjust enrichment. But "unless our Supreme Court decides to overrule itself, this court is bound by its rulings." *State v. Burkins*, 94 Wn. App. 677, 701, 973 P.2d 15 (1999). As a result, we are constrained to follow our Supreme Court's directives in *Connell*, 127 Wn.2d at 349-50. In *Connell*, our Supreme Court held that once a meretricious relationship is established, a presumption arises that the income and property acquired during the relationship are owned by both parties. *Id*. Once this presumption arises, we see no reason to depart from the strict tracing requirements in a marriage dissolution where the claim is that property at issue is separate and not community. If property would have been community property if the couple had married, it is analogous to community property in this setting regardless of whether there has been pooling of funds for joint projects or forgone opportunities.

Following *Connell*, we must reject Nash's argument to the contrary.

## III. Professional Goodwill

Nash argues that the trial court erred by dividing the professional goodwill at the conclusion of his meretricious relationship because it is properly characterized as separate property. Specifically, he asserts that goodwill is "an intangible 'asset' that at its heart represents an individual's earning capacity." Appellant's Reply Br. at 9. In addition, he challenges the trial court's finding that the value of his dental practice, including its goodwill, increased during his cohabitation with Chesterfield.

As discussed above, a party may overcome the rebuttable presumption that all property acquired during a meretricious relationship is owned by both parties by establishing by "clear and convincing proof" that the property is separate, i.e., by tracing with some degree of particularity the separate source of funds used for the acquisition. *Connell*, 127 Wn.2d at 350-51. We review the distribution of property at the end of a meretricious relationship for an abuse of discretion. *Koher v. Morgan*, 93 Wn. App. 398, 401, 968 P.2d 920 (1998).

In Washington, professional goodwill "is an intangible asset of a business, and is subject to division in a marriage dissolution." *In re Marriage of Knight*, 75 Wn. App. 721, 726, 880 P.2d 71 (1994); *but see* Martin J. McMahon, *Divorce and Separation: Goodwill in Medical or Dental Practice as Property Subject to Distribution on Dissolution of Marriage*, 76 A.L.R.4TH §§ 4, 6, 8, at 1033-40 (1990) (listing many jurisdictions in which professional goodwill is not a divisible marital asset). Our Supreme Court has explained that "[g]oodwill is not the earning capacity itself." *In re Marriage of Hall*, 103 Wn.2d 236, 241, 692 P.2d 175 (1984). Instead, it is defined as "the expectation of continued public patronage." *Knight*, 75 Wn. App. at 726. Professional goodwill "is a distinct *asset* of a professional practice, not

just a *factor* contributing to the value or earning capacity of the practice." *Hall*, 103 Wn.2d at 241. And goodwill—unlike earning capacity—may continue to exist after a professional retires or dies. *Id.* Therefore, we reject Nash's argument that the increased goodwill at his dental practice merely reflects increases in his income before and after he lived with Chesterfield.

In a marital dissolution case, Division Two of this court explained that goodwill is divisible notwithstanding its intangible character:

> The fact that professional goodwill may be elusive, intangible, and difficult to evaluate is not a proper reason to ignore its existence in a proper case, . . . and once its existence and value are ascertained, professional goodwill along with the other assets of the professional practice, should be included in a property division.

*In re Marriage of Lukens*, 16 Wn. App. 481, 486, 558 P.2d 279 (1976). Because Nash fails to set forth convincing reasons to depart from this reasoning in the context of meretricious relationships, we conclude that professional goodwill is an intangible asset of a professional practice, and is subject to division at the conclusion of a meretricious relationship, just as it would be at the conclusion of a marriage.

In this case, the trial court found—and Nash does not dispute—that Nash started his dental practice one year before he moved into Chesterfield's house. Although Nash assigns error to the trial court's finding that while he lived with Chesterfield, his "dental practice, with the support of Ms. Chesterfield, as well as his own labors, increased in value[,]" Clerk's Papers at 13, substantial evidence supports this finding. As aforementioned, Nash has not challenged the trial court's finding that Chesterfield assisted Nash in managing and building his practice. His challenge also overlooks the full significance of the ruling in *Connell*, 127 Wn.2d at 351, that income and property acquired during a meretricious relationship should be characterized in a

similar manner as income and property acquired during a marriage. Put another way, during a meretricious relationship, the parties' labors and earnings therefrom belong to the relationship. Thus, although substantial evidence supports the trial court's finding that the value of Nash's practice increased with the support of Chesterfield as well as Nash's own efforts, because Nash's labors belonged to the relationship during the period of cohabitation, the increase in value attributable to his labors would be subject to equitable division whether or not Chesterfield contributed to the increase by her labors. Chesterfield's contributions are significant because they support the trial court's determination that the parties had a meretricious relationship as defined by Washington case law; once that relationship is established, the monetary value of Chesterfield's and Nash's respective contributions to the increase in value is beside the point. Substantial evidence supports the trial court's finding that the goodwill in Nash's dental practice increased during his cohabitation with Chesterfield. Further, Nash did not establish by clear and convincing proof that the professional goodwill in his dental practice was his separate property. Therefore, the trial court did not abuse its discretion by characterizing it as a divisible asset.

## IV. Goodwill Valuation

Nash next argues that reversal is required because the trial court failed to articulate on the record the factors and method it used to calculate the value of the goodwill.

"Valuation of goodwill is a question of fact[.]" *Hall*, 103 Wn.2d at 246. A trial court must first determine whether goodwill exists, and then determine its value according to acceptable accounting methods. *In re Marriage of Crosetto*, 82 Wn. App. 545, 554, 918 P.2d 954 (1996); *see also Hall*, 103 Wn.2d at 243-45 (identifying a nonexclusive list of five acceptable accounting methods). "[O]ne or more accepted methods of valuation must be employed, though the particular method depends on the offered proof." *In re*

*Marriage of Luckey*, 73 Wn. App. 201, 206, 868 P.2d 189 (1994). The "overall goal is to achieve a just and fair evaluation of the existence and value of a professional's goodwill." *Id.* But a trial court's failure to "state on the record which factors and accounting method were used in arriving at its finding . . . deem[s] the valuation to be unsupported by sufficient evidence, necessitating reversal and remand for proper findings." *Crosetto*, 82 Wn. App. at 554.

Nonetheless, if a credible expert testifies that his or her valuation is based on acceptable accounting methods and the trial court adopts the expert's valuation or a valuation within the range of expert testimony, the trial court's valuation is supported by substantial evidence: "Where . . . the trial court's decision falls within the range of expert testimony given at trial . . . , and is reasonable in light of all the conflicting expert opinions, the decision is based upon substantial evidence and will be affirmed upon appeal." *In re Marriage of Harrington*, 85 Wn. App. 613, 637, 935 P.2d 1357 (1997). For example, in *In re Marriage of Sedlock*, 69 Wn. App. 484, 491, 849 P.2d 1243 (1993), this court held that a trial court may adopt a credible expert's value or it may adopt a compromise value—which is an amount higher than one credible expert's value but less than another credible expert's value—and the appellate court would be constrained to affirm. This is true where the trial court elects to explain its reasoning and the appellate court disagrees, and where the trial court adopts an expert's value or a compromise value without any explanation. *Id.* "To rule otherwise would be to place the appellate courts in the position of *weighing* expert testimony[.]" *Id.* Instead, the appellate courts look "to the reasonableness of the trial court's bottom line result, in light of all of the expert testimony." *Id.*

In this case, Certified Public Accountant (CPA) Roland T. Nelson, Chesterfield's valuation expert, used both the "excess earnings" method and the "percent of gross receipts" method to value the increase in Nash's dental practice's goodwill during Chesterfield and Nash's cohabi-

tation. The "excess earnings" accounting method is one that Washington courts have recognized as acceptable to determine the value of goodwill. *See, e.g., Hall*, 103 Wn.2d at 244. And the "percent of gross receipts" method, which Nelson described as "a statistical average of actual sales of dental practices[,]" Report of Proceedings at 122 (June 10, 1997), reflects the "market value approach" that has been recognized by Washington courts. *See Hall*, 103 Wn.2d at 244-45.

Applying the "excess earnings" method, Nelson valued the goodwill of Nash's dental practice in 1989, i.e., before Chesterfield and Nash's cohabitation, at $0 and at $129,000 in 1993, i.e., after Nash moved out of Chesterfield's house. Nelson therefore calculated the increase in goodwill of Nash's dental practice under the excess earnings method to be $129,000, which is the difference between these two figures. By contrast, under the "percent of gross receipts" method, Nelson valued the goodwill at $95,000. Report of Proceedings at 131 (June 10, 1997); Ex. 177 (reflecting a $39,000 value before Chesterfield and Nash's cohabitation and a $134,000 value after Nash moved out of Chesterfield's house, for a difference of $95,000). CPA Kirk Erickson, Nash's valuation expert, criticized Nelson's figures but did not provide an independent opinion regarding the goodwill value in this case.

In the oral decision, the judge observed that "there are a number of ways in which taking a look at goodwill double counts a number of things[.]" Report of Proceedings at 6 (June 12, 1997). Thus, the judge "dispute[d] the calculations per se[,]" explaining that the methodologies were imperfect. *Id.* at 11. Specifically, she noted that Nelson's valuation of the goodwill at zero before the meretricious relationship is counterintuitive because Nash had already purchased the practice and put work into it. The judge also noted that the goodwill value reflects the amounts in Nash's savings and checking accounts. The amounts in Nash's savings and checking accounts presumably reflected, at least in part, Nash's excess earnings, which the trial

court counted separately when valuing the property accumulated during the relationship. The court also noted that Chesterfield had already benefited, during the relationship, from a portion of Nash's excess earnings. The judge then recognized that Chesterfield's contributions to Nash's dental practice made Nash's professional life better, but did not add to the goodwill of the practice in and of themselves.

The trial judge determined that the "increase in the value of the goodwill in Dr. Nash's practice, attributable to 'community' funds or efforts is the amount of $40,000." Clerk's Papers at 13. She further explained that she set "the goodwill at $40,000 not because I know that that's the difference between what happened in '93 less what it was in 1989. But I think that that's a fair ballpark given the sets of figures that even [Chesterfield]'s accountant came up with." Report of Proceedings at 14 (June 12, 1997).

In sum, Chesterfield presented two acceptable accounting methods and Nash presented none. In light of Nash's criticism of Chesterfield's proposed valuations, the trial judge reduced Chesterfield's figures more than 50 percent. Unlike the trial judge in *Sedlock*, 69 Wn. App. at 491, the trial judge here did not adopt a compromise figure between two competing experts' valuations. Instead, she adopted a value below Chesterfield's figures. Although Nash elected not to present an independent figure at trial, he contends on appeal that reversal is required because the judge failed to articulate which accounting method she used to arrive at her valuation. In other words, Nash suggests that the trial judge was required to either adopt one of Chesterfield's figures or articulate an independent accounting method unrelated to the evidence presented at trial to justify her valuation. We reject this argument.

As discussed above, the trial judge may adopt the value of a credible expert or a value within the range of conflicting expert testimony presented at trial *without explanation* and this court would be constrained to affirm. *See Sedlock*, 69 Wn. App. at 491; *see also Harrington*, 85 Wn. App. at 637. Consequently, if Nash had presented an independent

valuation of the increase in goodwill at his dental practice that was lower than Chesterfield's valuations, the trial judge could have selected a compromise valuation that was reasonable and supported by substantial evidence without explaining her reasoning and this court would be constrained to affirm. A party may not defeat the trial judge's ability to set the value of property simply by arguing that the other side did it wrong while refusing to submit an independent figure. In cases such as this one, if the judge's bottom line number is reasonable in light of all the evidence, this court is constrained to affirm, even if we would not have used the trial judge's approach—for to do otherwise would place us in the position of weighing expert testimony and invading the role of the trier of fact. As we did in *Sedlock* and *Harrington*, we once again reject the invitation to exceed our appellate function.

Where, as here, the trial judge is persuaded by conflicting evidence that the testifying expert's figure is indeed too high, but that there is, nevertheless, a value that needs to be established, she may—as was done in this case—select a lower figure and articulate her reasons for doing so. The judge adopted a value and explained in detail why she did not believe that the increase in goodwill during Chesterfield and Nash's cohabitation was as high as Chesterfield proposed it was. Although the trial court's valuation was lower than that proposed by Chesterfield's expert, it was nevertheless within the range of credible expert testimony that was, in turn, based on accepted accounting methods. Because the trial judge achieved a just and fair evaluation of the value of the increase in the professional goodwill in Nash's dental practice, we affirm her valuation of the goodwill.

The trial court's order is affirmed in its entirety.

COLEMAN and GROSSE, JJ., concur.

Review granted at 138 Wn.2d 1016 (1999).