IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| ROBERT BIEHL and MICHELLE BIEHL,<br><br>Appellants,<br><br>v.<br><br>JOSEPH L. OSTHELLER, individually and on behalf of his marital community,<br><br>Respondent,<br><br>RUTH JEAN OSTHELLER, n/k/a TAYLOR, individually and on behalf of her marital community,<br><br>Defendant. | No. 83414-2-I<br><br>DIVISION ONE<br><br><br>UNPUBLISHED OPINION |

BOWMAN, J. — Landlords of residential property appeal from an order on summary judgment, findings and conclusions after a subsequent bench trial, and findings in support of an award of attorney fees. We conclude that genuine issues of material fact precluded summary judgment. We reverse, vacate the findings and conclusions as far as they relate to the erroneous summary judgment ruling, and remand to the trial court for further proceedings.

FACTS

Robert and Michelle Biehl (Landlords) owned a residence in Gig Harbor. In February 2015, they executed an agreement with Joseph Ostheller and his then-

spouse Ruth Taylor[1] (Tenants) to lease the property.[2] The lease provided for a security deposit of $4,200, rental payments of $2,650 due the first of each month, and a late fee of $200.[3] The lease also included provisions requiring the Tenants to maintain the premises and its landscaping.

The original one-year lease expired on January 31, 2016. After that date, tenancy continued on a month-to-month basis. But, unbeknownst to the Landlords, the Tenants separated on August 21, 2016, and Ostheller moved out of the home that day. Still, he was often at the Gig Harbor residence visiting his children, discussing matters with Taylor, and removing personal property. Ostheller also continued to pay the rent[4] and communicate with the Landlords about the lease and maintenance issues.

That winter, Robert[5] "heard" that the Tenants were having marital trouble and, on December 3, 2016, asked Ostheller about his living arrangements. Ostheller responded, "I'm not sure if we will go through with the divorce. I'm here at the house a lot. But officially living with my dad in Poulsbo."

By this time, Tenants had repeatedly requested reimbursement for repairs they claimed to have paid for without the Landlords' permission. Because of these unauthorized repairs, the failure to produce receipts for those repairs, not paying

---

[1] The 2015 lease refers to Taylor by her former name, Ruth Ostheller.

[2] According to the lease, the couple rented the property as a residence for themselves, their two teenaged children, and Taylor's mother.

[3] Tenants owed a late fee if the Landlords did not receive rent within five days of the due date.

[4] According to the Landlords, the Tenants regularly paid rent late but "never paid the late fees."

[5] We refer to Robert and Michelle Biehl by their first names when necessary for clarity and intend no disrespect by doing so.

late fees, and then failing to pay rent in December, the Landlords started eviction proceedings. On December 10, 2016, they arranged for service of a 20-day notice of termination of tenancy posted on the front door of the home, addressed to both Tenants.[6] Ostheller was at the house at the time of service and received the termination notice.

Ostheller texted Robert that he received the notice, and the two began a series of text messages over the next several days about appliance and water pressure issues. The Landlords repeatedly refused to waive the overdue December rent or reimburse the Tenants for alleged repair bills without receipts. Eventually, on December 13, 2016, Ostheller agreed to pay December rent and asked, "Would you like me to overnight the check or is it simply good enough that I send the payment from my bank system." Then, on New Year's Eve, Ostheller sent Robert the following message with a screenshot to show his bank had processed the December rent payment:

> My wife is anxious about a text received from you about someone picking up the keys[.] As though we didn't pay the rent this month. But, [I] did pay it, so, . . . [.] Please explain. I thought we were good. However, [I] [h]aven[']t sent the rent for Jan[uary] yet. Are you expecting us to move out right now?

Robert told him, "The lease is up as of Midnight. No rent has been received for January. The rate will be [$]3500 for holdover rent prepaid 3 months at a time."

Shortly after this exchange, in a group text message between the Tenants and Robert, Taylor explained that her mother was on hospice and that she could not move her or vacate the property "today, tomorrow[,] or next week." Ostheller

---

[6] See RCW 59.18.200(1)(a) (landlord my terminate month-to-month tenancy by 20-day written notice).

3

asked if they could extend the lease for one month, or "[p]ossibly two," under these circumstances. Robert reiterated his offer to extend the lease if the Tenants prepaid three months' rent at an increased monthly rate of $3,500.

Taylor said she would not agree to a rent increase. Robert responded, "We will not be renting it for [$]2650 again." He also said they were not willing to lease the property solely to Taylor "[b]ecause [Ostheller] is who we leased to and [he] is who we will go after to collect from. We rented to a married couple not a single un[ ]employed woman."

A few hours later, only Ostheller texted another proposal to Robert:

I just talked to [Taylor] on the phone. She sounds like she is getting a cold or flu, and she asked me to communicate with you about the rent. She would like to have me pay you for the rent for Jan[uary], and then on the first for the first 15 days of Feb[ruary]. She promises to be out by [F]eb[ruary] 15.

Robert responded, "You'll need to wire it in the morning."

The Tenants' divorce became final on January 4, 2017.[7] On January 12, Robert texted both Tenants, stating that he had not heard from them since New Year's Eve, received January rent, or received confirmation that they had moved out. He offered them "one last chance" to pay the rent owed and provide a "concrete" date to move out before he would proceed with an unlawful detainer action. A few days later, Ostheller told Robert that the house Taylor planned to rent was no longer available and that she was "back to square one." He said he would pay February rent by the first of the month and asked, "Is that agreeable." Robert responded, "Still haven't received January rent check."

---

[7] Nothing in the record indicates that either Tenant informed the Landlords of the divorce.

Again, in February 2017, Robert texted Ostheller about the late rent and Taylor's plans. Ostheller told him that the rent payment was "scheduled to go out" in a couple of days. After what appears to be no communication for two months, Robert texted Ostheller again in May about the rent for that month. Ostheller explained that he mailed a check, but the post office returned it, and he promised to resend it promptly with the "address modification per [Robert's] instruction."

Taylor moved out of the home in July 2017. At that time, Ostheller sent Robert a message stating the property was nearly ready to turn over, but he still planned to "sweep out the garage and make another run to the dump." Ostheller told Robert that a moving truck was still parked in the driveway.

On July 20, Michelle and Ostheller[8] inspected the vacant house. She prepared a "Move Out Inspection Report" detailing the condition of the property. Ostheller signed the report, acknowledging that he was present, but wrote at the bottom of each page, "I don't agree with all findings." A few weeks later, the Landlords sent the Tenants a statement, providing the basis for retaining their damage deposit and an estimate of the additional damages owed. The Tenants did not respond.

The Landlords sued the Tenants in November 2017. They filed an amended complaint in September 2018, alleging breach of the lease, seeking unpaid rent, late fees, costs to restore the property to its prerental condition, and lost rent while they restored the property. They also alleged timber trespass and waste under chapter 64.12 RCW, seeking treble damages. Finally, the Landlords

---

[8] According to the Landlords, Taylor refused to be present.

alleged diminution in value, seeking damages plus prejudgment interest. They also requested attorney fees and costs as authorized by the lease.

Ostheller moved for partial summary judgment, arguing that his tenancy terminated on December 31, 2016—20 days after the Landlords served the termination notice—and that he did not enter into a new rental agreement. He argued he was not liable for any unpaid rent or damages that accrued after December 31, 2016. He also claimed there was no evidence to support the timber trespass claim.

The Landlords sought partial summary judgment as to Ostheller's liability. They argued that Ostheller remained a month-to-month tenant until July 2017 and was therefore jointly liable with Taylor for $11,444 in unpaid rent, late fees, and additional damages during the tenancy.

After a hearing on December 7, 2018, the court entered a written order, ruling:

> Defendant Joseph Ostheller's motion is granted in part. Dr.[9] Ostheller is not liable for rent that accrued after December 31, 2016. However, the issue of whether Dr. Ostheller is liable for damages or claims other than rent are reserved for trial.[10]

---

[9] Ostheller is a dentist.

[10] The written order directly conflicts with the court's oral ruling immediately following the hearing. The court stated:

> I'm going to deny summary judgment for rent after December 31, 2016, because I think there are genuine issues of material fact regarding whether there was a contract between Ostheller and the [Landlords]. So that'll be something that will have to go to trial.
> With respect to damages and other claims, I am going to deny summary judgment because, again, I think there are issues of fact as to when things occurred, whether or not . . . Ostheller actually was a tenant. I think those will need to be fleshed out at trial.

Between the trial court's written order and its conflicting oral ruling, the written order controls. See Lang Pham v. Corbett, 187 Wn. App. 816, 830-31, 351 P.3d 214 (2015) ("A written order controls over any apparent inconsistency with the court's earlier oral ruling."). Neither party argues otherwise.

The court determined that Ostheller was liable for late fees of $750 incurred as of December 31, 2016 and denied his motion as to the timber trespass claim, reserving the issue for trial.[11] Finally, the court denied in part and granted in part the Landlords' motion "for the same reasons."

Taylor died in June 2019, and the case proceeded against only Ostheller.[12] A bench trial took place over two days in June 2020. The judge who presided over the bench trial was not the same judge who ruled on the summary judgment motions. The court heard testimony from the Landlords, Ostheller, Ostheller's current spouse, and a former tenant. The court considered more than 70 exhibits.

During closing argument, the Landlords claimed that Ostheller's tenancy was continuous through July 2017. But Ostheller, consistent with the order on summary judgment, argued that the Landlords terminated his tenancy on December 31, 2016 and that he did not enter into a new agreement with them.

The trial court pointed to the apparent "inconsistent" ruling on summary judgment and asked, "How is it that there is not a factual question with regard to rent, but there is a factual question with regard to ongoing obligation for damages." The court observed that before reaching the damages issue, it needed to resolve whether liability for damages would align with the prior court's legal ruling. The

---

[11] The court denied reconsideration of Ostheller's motion on the timber trespass claim, and a commissioner of Division Two of this court later denied discretionary review of the court's ruling.

[12] The Landlords served Taylor's estate with notice of a creditor's claim and their motion to substitute, and the court allowed substitution of Taylor's estate on the first day of trial. But it does not appear that any party joined the estate in the proceedings.

trial court considered supplemental briefing on that issue and the "impact" of the summary judgment ruling.[13]

In a letter ruling, the trial court stated that the summary judgment order was revisable under CR 54(b).[14] But because neither party requested modification, it would "respect" the summary judgment ruling and "let it inform" the court's resolution of the remaining issues. The court determined that "the only logical" interpretation of the summary judgment ruling was that Ostheller's month-to-month tenancy terminated on December 31, 2016 and that he was "no longer a 'tenant' " after that date.

The court found that Ostheller admitted to incidents during his tenancy that supported some of the claimed damages, including pet damage to the carpets and water damage to the kitchen and laundry room. But as to others, the court concluded that "[e]vidence of damage seven months after termination of the tenancy does not support a finding that the damage was caused by Dr. Ostheller." The court also found that some claims failed for other reasons, including failing to establish certain conditions existed on the property when Ostheller took possession in 2015 and failing to establish damage beyond normal "wear and tear."

On August 19, 2020, the trial court entered findings of fact and conclusions of law consistent with its oral ruling. Based on the summary judgment rulings, it

---

[13] The trial court also asked for briefing on whether the independent duty doctrine affected the Landlords' ability to recover under both contract and tort theories.

[14] CR 54(b) provides that absent written findings, the trial court may revise a decision that adjudicates fewer than all claims or does not decide the rights and liabilities of all parties before entry of final judgment.

issued conclusions of law stating that no contract existed between Ostheller and the Landlords after December 31, 2016 and that Ostheller was not liable for unpaid rent or late fees accrued after that date.[15] The court also concluded that Ostheller was liable for damages of $8,693.78 to replace carpets and repair flooring but that he was not liable for damages related to walls, baseboards, landscaping, kitchen cabinets, the driveway, septic issues, or smoking. The court determined that Ostheller was entitled to an offset of half of the $4,200.00 security deposit. Finally, the court rejected the Landlords' claims for lost rent, timber trespass, waste, and recovery based on their personal labor to restore the property.

Both parties sought attorney fees under a provision of the lease which provides for "reasonable attorney fees and costs" to the "prevailing party" in any action arising out of the lease. Following a hearing, the court determined that Ostheller prevailed on most of the issues and entered an order on October 20, 2020 granting his petition.[16] The court also found that Ostheller's September 2019 offer of judgment for $60,000.00 was greater than the Landlords' damages, costs, and fees as of the date of the offer. So the court calculated the parties' awardable fees as of the date of the offer of judgment and awarded total judgment of $18,674.59 to Ostheller.

---

[15] Consistent with the summary judgment ruling, the court found that Ostheller was liable for late fees accrued before 2017, and that he had satisfied that debt before trial.

[16] The record on appeal includes neither the transcript of this hearing nor the additional briefing and documents the parties submitted at the court's direction.

The Landlords appeal.[17]

ANALYSIS

The Landlords contend the court erred at summary judgment by concluding as a matter of law that they had no contractual relationship with Ostheller in 2017. They point to evidence in the record of "explicit and voluntary actions" showing that Ostheller remained a cotenant with Taylor after December 31, 2016. We agree.

Whether a court properly granted summary judgment is a question of law that we review de novo.[18] In re Kelly & Moesslang, 170 Wn. App. 722, 731, 287 P.3d 12 (2012). In considering summary judgment, a court must consider all facts submitted and all reasonable inferences from those facts in the light most favorable to the nonmoving party; here, the Landlords. Vasquez v. Hawthorne, 145 Wn.2d 103, 106, 33 P.3d 735 (2001). A court properly grants a summary judgment motion only if the evidence before it shows no genuine issues of material

---

[17] Ostheller asks us to dismiss the Landlords' appeal because their briefing does not include proper assignments of error and issues pertaining to those assignments. See RAP 10.3(a)(4). But the Landlords' assignments of error along with the list of "issues raised" and the appendices to their brief, which include brackets to designate challenged findings and conclusions, are enough to apprise us of the substance of their claims. We are unpersuaded by Ostheller's assertion that it was "exceedingly difficult" to discern the Landlords' claims, and decline to resolve this appeal based on noncompliance with the rules or impose sanctions. See RAP 1.2(a) ("Cases and issues will not be determined on the basis of compliance or noncompliance with these rules except in compelling circumstances where justice demands."); RAP 18.9(a) (providing authority to impose sanctions on a party or counsel who violates the rules).

[18] Ostheller argues we should review the trial court's finding that his tenancy terminated in December 2016 for substantial evidence because the court weighed the evidence at trial and independently reached that conclusion. See Viking Bank v. Firgrove Commons 3, LLC, 183 Wn. App. 706, 712, 334 P.3d 116 (2014) (review of decision following a bench trial considers whether substantial evidence supports the trial court's findings of fact and whether those findings support the conclusions of law). But in its letter ruling, the trial court determined that "the only logical conclusion that can be drawn from [the summary judgment court]'s Order of December 7, 2018" is that Ostheller's tenancy terminated on December 31, 2016, and that it would "respect" that order. As a result, we review the summary judgment order that decided the issue as a matter of law, not the trial court's finding.

fact, the moving party is entitled to judgment as a matter of law, and "reasonable persons could reach but one conclusion." Vasquez, 145 Wn.2d at 106 (citing CR 56(c)). "[E]ven if the basic facts are not in dispute, if the facts are subject to reasonable conflicting inferences, summary judgment is improper." Southside Tabernacle v. Pentecostal Church of God, 32 Wn. App. 814, 821, 650 P.2d 231 (1982); Sanders v. Day, 2 Wn. App. 393, 398, 468 P.2d 452 (1970) (summary judgment not designed to resolve inferential disputes).

Paragraph 2B of the lease states the initial fixed-term lease expired January 31, 2016. That section also provides:

> Tenant shall vacate the Premises upon termination of the Agreement, unless: (i) Landlord and Tenant have extended this Agreement in writing or signed a new agreement; (ii) mandated by local rent control law; or (iii) Landlord accepts Rent from Tenant (other than past due Rent), in which case a month-to-month tenancy shall be created which either party may terminate as specified in paragraph 2A. Rent shall be at a rate agreed to by Landlord and Tenant, or as allowed by law. All other terms and conditions of this Agreement shall remain in full force and effect.[19]

It is undisputed that when the fixed-term lease expired on January 31, 2016, the Tenants continued to possess the property and the Landlords continued to accept rent, so the tenancy converted to month-to-month. And although the record on appeal does not include the notice itself, it is also undisputed that the Landlords properly served the notice to terminate the month-to-month tenancy on December 10, 2016 under RCW 59.18.200(1)(a), but did not proceed with eviction by filing an unlawful detainer action. The question before the court on summary judgment was whether the undisputed facts showed an agreement between the

---

[19] Emphasis added.

Landlords and Ostheller to extend month-to-month tenancy after December 31, 2016.

"Leases are contracts, as well as conveyances." Seattle-First Nat'l Bank v. Westlake Park Assocs., 42 Wn. App. 269, 272, 711 P.2d 361 (1985). In the context of a lease, as with contracts in general, mutual assent is required for the formation of a valid agreement. Leda v. Whisnand, 150 Wn. App. 69, 78, 207 P.3d 468 (2009). To determine mutual assent, Washington follows the objective manifestation theory of contracts. Multicare Med. Ctr. v. Dep't of Soc. & Health Servs., 114 Wn.2d 572, 586, 790 P.2d 124 (1990).[20]

> [T]he unexpressed subjective intention of the parties is irrelevant; the mutual assent of the parties must be gleaned from their outward manifestations. To determine whether a party has manifested an intent to enter into a contract, we impute an intention corresponding to the reasonable meaning of a person's words and acts.

Multicare, 114 Wn.2d at 587.[21] The existence of mutual assent generally is a question of fact but may be determined as a matter of law if reasonable minds could not differ. Multicare, 114 Wn.2d at 586 n.24; P.E. Sys., LLC v. CPI Corp., 176 Wn.2d 198, 207, 289 P.3d 638 (2012).

The evidence before the court at the time of the summary judgment ruling showed the Landlords continued to accept month-to-month rent for the home between January and May 2017 and expected rent for June and July. While Taylor continued to live at the property in 2017, Ostheller negotiated and communicated with the Landlords about the rent, and he made most, if not all, of

---

[20] Overruled in part by statute on other grounds as stated in Neah Bay Chamber of Commerce v. Dep't of Fisheries, 119 Wn.2d 464, 832 P.2d 1310 (1992).

[21] Citations omitted.

the payments.  And when Taylor moved out in July 2017, Ostheller prepared the property for turnover, he alone returned the property to the possession of the Landlords by accompanying Michelle during her inspection of the property, and he signed the Move Out Inspection Report.  While Ostheller did not live at the residence between January and July 2017, this fact may not be dispositive since his tenancy undisputedly continued for several months after he moved out in August 2016.  Because the evidence at summary judgment showed there were genuine issues of fact as to whether the Landlords had an agreement with Ostheller to continue his tenancy after December 31, 2016, the court erred by granting summary judgment on that issue.

Still, Ostheller suggests that he was entitled to summary judgment as a matter of law, regardless of any competing inferences, because his month-to-month tenancy could not continue once the Landlords served the termination notice.  But Ostheller provides no authority to support his argument.[22]  We are also unpersuaded by Ostheller's reliance on out-of-state authority and an unpublished decision of this court to argue that "one tenant cannot be involuntarily bound to a new tenancy by the acts of another."  See Bockelmann v. Marynick, 788 S.W.2d 569, 572 (Tex. 1990) (presumption that one cotenant's holding over binds another cotenant is contrary to general principles of Texas law); Fin. Assistance, Inc. v. Slack, No. 72361-8-I, slip. op. at 9-10 (Wash. Ct. App. Nov. 10, 2014) (unpublished), http://www.courts.wa.gov/opinions/pdf/723618.pdf (cosigner of original fixed-term lease stopped being a tenant when the lease expired because

---

[22] We need not consider arguments unsupported by citation to authority.  Cowiche Canyon Conservancy v. Bosley, 118 Wn.2d 801, 809, 828 P.2d 549 (1992); see RAP 10.3(a)(6).

he took no acts to bind himself as lessee in subsequent month-to-month tenancy, did not possess the premises or pay rent, and had no communication with the landlord or other tenants).

Construing the evidence and all reasonable inferences therefrom in the light most favorable to the Landlords, there is evidence in the record of words and conduct manifesting an intent to continue Ostheller's joint tenancy after December 31, 2016. As a result, the court erred by granting summary judgment on that issue as a matter of law. And because the trial court's findings and conclusions flowed from the summary judgment ruling that "[n]o tenancy or contractual agreement existed" between Ostheller and the Landlords after that date, we reverse and vacate the findings and conclusions as far as they relate to the erroneous ruling on summary judgment. We remand for trial on the issue of when Ostheller's tenancy ended, as well as the issues that flow therefrom.[23] The trial court may then revisit its decision on attorney fees.

---

[23] Because we reverse and vacate the trial court's findings and conclusions implicated by the summary judgment order, we need not address the Landlords' challenges to specific findings and conclusions. But we address several issues the Landlords raised that may resurface on remand. Specifically, the Landlords contend (1) the court improperly placed the burden of proof on them to show that Ostheller caused damages during their contractual relationship; (2) the trial court erred by denying claims for some damages because the Landlords chose not make repairs; and (3) the trial court erred when, for purposes of attorney fees, it separated their breach of contract claim into eight distinct claims involving different aspects of the property.

The Landlords fail to establish reversible error with respect to any of these claims. First, as plaintiffs, the Landlords bore the burden to establish the elements of their claim, including a valid contractual relationship at the time of the alleged breach and damages. See Citoli v. City of Seattle, 115 Wn. App. 459, 476, 61 P.3d 1165 (2002) (a breach of contract cause of action requires plaintiff to prove a valid and enforceable contract, the rights of the plaintiff and obligations of the defendant under the contract, violation of the contract by the defendant, and damages to the plaintiff). Second, no authority supports the Landlords' position that they had a right to recover the estimated costs of unperformed repairs unless Ostheller could show that "the diminution in value was somehow less than the cost of remediation." And finally, because several different areas and aspects of the property needed separate repairs, ample evidence supported segregating the Landlords' claims.

Reversed, vacated in part, and remanded for further proceedings consistent with this opinion.[24]

WE CONCUR:

---

[24] Both parties request an award of attorney fees under RAP 18.1 and the attorney fee provision in the lease. RAP 18.1(a) authorizes an award of attorney fees and costs from appeal when authorized by law. We deny both requests as premature. The Landlords' partial success on appeal does not equate to actual relief because the claim that survived summary judgment is not yet resolved. But if the Landlords are ultimately entitled to additional relief on remand and the trial court concludes fees and costs are appropriate, the trial court may award reasonable fees and costs for this appeal. See RAP 18.1(i) (trial courts may determine amount of appellate fees on remand).